<u>**EXHIBIT "A"**</u>

**PROPOSED AMENDED COMPLAINT**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BEENDER OVERSEAS, LTD., | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | C.A. No. H-06-2460 |
| | § | |
| SPECIALTY PROCESS EQUIPMENT | § | JURY DEMAND |
| CORPORATION, | § | |
|     Defendant. | § | |

## BEENDER OVERSEAS, LTD.'S FIRST AMENDED COMPLAINT

COMES NOW, Beender Overseas, Ltd. ("Plaintiff" or "Beender"), complaining of Specialty Process Equipment Corporation ("SPEC") and Zafar Sheikh ("Sheikh") and in support thereof, would show as follows:

### GENERAL BACKGROUND ALLEGATIONS

1.      Plaintiff Beender is in the business of providing equipment, supplies and services to oil and gas exploration and production industry.

2.      Defendant SPEC operates a company that designs and manufactures oil and gas processing equipment.

3.      This is an action to recover Plaintiff's damages, losses and costs associated with Defendant SPEC's breach of contract and failure to cure its breach after demand.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331 based upon a question of laws of the United States through an international treaty, and pursuant to 28 U.S.C. §1332(a)(2) because this action is between citizens of a State and a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper pursuant to 28 U.S.C. §1391(a) because Defendants reside in the Southern District of Texas and a substantial part of the events or omissions giving rise to the claim occurred in the Southern District.

6.     Defendants are subject to the personal jurisdiction of this Court.

## THE PARTIES

7.     Plaintiff is a company with its principal place of business in Paris, France.

8.     Defendant SPEC is a Texas corporation with its principal place of business located within the judicial district of this Court.  SPEC has made an appearance in this action.

9.     Defendant Zafar Sheikh is an individual and resident of the State of Texas and maintains office addresses at 5946 Ridgedale Drive, Houston, Texas 77039 and 6400 Hawes Road, Houston, Texas 77396.

Beender Overseas, Ltd.'s
First Amended Complaint – Page 2

## PURCHASE ORDER CONTRACT ALLEGATIONS

10.     Plaintiff Beender entered into a contract with a customer to provide large line heaters (*i.e.*, equipment used to heat crude oil).

11.     Beender selected Defendant SPEC as a possible subcontractor for the manufacture of such machines on the basis of SPEC's representations that it could fabricate and provide equipment that met the drawings and specifications supplied by Beender.

12.     Beender provided detailed design plans and specifications to Defendant SPEC for review and analysis, then executed that certain Purchase Order dated September 27, 2005 (Exhibit "A" incorporated herein and attached) to manufacture and deliver two 7.5MM BTU/hour oil pipeline indirect-fired heaters (the "Heaters") for delivery C.I.F. to Pointe Noire, Republic of Congo, under specifications and designs as provided.

13.     The Purchase Order incorporated and included the following terms on the face thereof:

**CONDITIONS     Deliv, by 01/31/06**

**HEATERS 301 A/B**

Heaters as per Spec-Pro quote 05182 dated 09/05/06

Heaters to be built in accordance to Drawings and information provided in the data book sent by mail and information contained in 02 emails sent on Sept 1, 2005

Beender Overseas, Ltd.'s
First Amended Complaint – Page 3

**Delivery:** January 31, 2006 latest - 2% Late delivery penalty applies

**Payment Terms:**
20% with the receipt of PO
20% upon receipt of major material, head, shell, tubes & coils
40% upon 50 to 70 % Fabrication Completed
20% upon shipment

14.     The "Spec-Pro quote 1051682" consisted of a cover letter and seven pages of specifications, terms and price quotation. (Exhibit "B" incorporated herein and attached).

15.     "Drawings and information" as referred to in the Purchase Order consist of detailed blueprints and specification charts set forth in data provided to Defendants prior to the Purchase Order date.

16.     The Purchase Order, which was issued by Beender and communicated to Defendant SPEC for acceptance, indicated clearly, "[p]lease sign this Purchase Order for acceptance and fax it back to us […] for validation of order."

17.     Defendant SPEC signed the Purchase Order and returned it to Beender as indicated. The signed Purchase Order then constituted a valid and binding contract between Plaintiff and SPEC.

18.     The contract provided payment terms in a schedule of payments totaling $459,700.00 (US Dollars).

19.    SPEC's September 5, 2005 "Spec-Pro quote 05182" offered completion and delivery of each Heater at a quotation of $229,850.00.

20.    The Purchase Order contract required completion and delivery of two Heaters "ex-works" by "January 31, 2006 latest".  Time was of the essence, and SPEC knew that.  Before SPEC signed the Purchase Order, Plaintiff advised SPEC that Plaintiff's customer required timely delivery and that the customer's quality standards must be met by the agreed upon delivery date.  The express condition in the Purchase Order requiring delivery by January 31, 2006 and the other terms and/or the nature of the purpose of the contract and the circumstances surrounding the formation of the contract made it apparent that the parties intended that time be of the essence.

21.    In accordance with the terms of the contract, a first payment representing twenty percent of the contract price, *i.e.* $91,940.00, was paid by Beender to SPEC further to a corrected invoice issued by SPEC on September 20, 2005.

22.    The contract provide that "upon receipt [by SPEC] of major material, head, shell, tubes & coils", a second $91,940.00 payment would by invoiced by SPEC by Beender and would by payable by Beender.

23.    Although Defendant SPEC had not received the "major material, head, shell, tubes & coils" provided for in the contract, on December 23,

2005, SPEC delivered to Beender an invoice requesting that Beender pay $91,940.00 to SPEC, such payment representing the second payment under the contract.

24.   Although SPEC had not met the condition precedent for the second payment, Beender trusted SPEC and relied upon its representations, to pay the second invoice in full.  Beender made total payments to SPEC of $183,880.00.

## THE BREACH

25.   During course of the project, Beender became aware that problems existed with SPEC's performance under the contract.  To alleviate its concerns of delay, Beender sent its representatives to SPEC's shop to investigate the progress of the fabrication and to estimate a completion and delivery date.

26.   The report from Beender's representatives indicated that SPEC was not likely to provide the Heaters as provided under the contract terms.

27.   Beender requested adequate assurance in writing from SPEC that the Heaters could be delivered as ordered.  Such assurance was not provided to Beender within a reasonable time, and the Heaters were not delivered as ordered. For example, on several occasions, Beender requested from SPEC a firm action plan instead of mere words of comfort.  Such action plan was never provided. Beender repeatedly reminded SPEC that Beender and its consultants remained available to provide SPEC with technical support.   SPEC never requested

Beender's help.

28.     Beender sought to salvage the contract by allowing a limited extension and again demanded assurance of completion in writing from SPEC. SPEC, however, failed and refused to provide Beender adequate assurance within a reasonable time.  Such failure constituted a repudiation of the contract by SPEC.

29.     SPEC replied on February 22, 2006, to Beender's further request for assurances with an e-mail, indicating that the Heaters were not ready for shipment.  <u>SPEC requested that Beender pay $134,594.00 more than the purchase price contracted <i>for each Heater</i> in order to deliver the Heaters not simply as ordered, but with a significant delay</u>.  That email proved to be a justification by Defendant for additional monies requested by Defendant.  SPEC showed no precise action plan that would have given Beender the ability to assess SPEC's ability to finish within a new deadline.  SPEC's conduct amounted to an anticipatory breach of the contract between Beender and SPEC .

30.     Beender rejected SPEC's request to pay additional money for the Heaters ordered from SPEC.

31.     Beender later learned that SPEC had cash flow problems, notwithstanding that it had a $1 million line of credit that it had drawn down, and that SPEC had used advance payments paid by customers on certain projects to cover expenses for material and labor for other projects.

### LOSSES, COSTS AND OTHER DAMAGES

32.     Beender then sought to cover and mitigate its damages by seeking replacement equipment from alternate suppliers who could deliver to Beender's customer.

33.     Beender demanded a return of the $183,880.00 paid to Defendant SPEC under the contract.

34.     Defendant SPEC initially agreed to refund all the advances in an email dated February 23, 2006.  Then, in an email sent later the same day, SPEC asked for "a couple of months" to reimburse Beender.  Obviously, SPEC had (and has today) cash flow problems.  Beender replied to SPEC the next day and offered an extension of time until May 31, 2006 to reimburse Beender. Beender also asked SPEC to confirm its agreement therewith.  Defendant SPEC never confirmed its agreement with those payment terms. In effect, SPEC thus refused to return any of Beender's funds, despite having earlier agreed to return the money.

35.     Beender was also forced to incur additional funds, costs, and expenses to replace the Heaters ordered from Defendant SPEC with other equipment from alternate suppliers.

36.     Beender paid $415,000.00 for a rush order replacement heater

from an Italian manufacturer that could deliver immediately.

37.     Beender paid $284,000.00 for a larger heater unit from a Canadian seller with the equipment ready to deliver.

38.     The shipping quotes received for delivery of the Heaters from Houston to Pointe Noire was $110,000.00.

39.     Shipment of the replacement heaters under terms of immediate delivery cost Beender $147,329.00.

40.     The difference in the purchase price of the replacement heaters ($699,000.00) from those ordered from SPEC ($459,000.00) is $239,300.00.

41.     The difference in shipping costs of the replacement heaters ($147,329.00) from those ordered from SPEC ($45,000.00) is $38,000.00.

42.     Beender was forced to pay additional costs in the amount of $106,800.00 in order to cover effectively SPEC's breach and to avoid a breach of its own contract with the ultimate customer.   Such costs included the administrative and travel costs of locating and inspecting replacement equipment, assembly and labor costs for post-shipment assembly on a heater delivered in stages, and the additional insurance and cargo loading fees incurred due to the form of the replacement machines and the urgency with which such machines were forced to be delivered.

43.     Beender has expended more than $35,000.00 on attorney's fees

and court costs with the precise amount to be proven at trial.

## THE DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE

44.    Defendant SPEC is liable to Beender because it contracted with Beender to fabricate the Heaters.

45.    As Defendant SPEC advertised on its internet web site at all material times to this action, SPEC had branches in Sharjah, United Arab Emirates ("UAE") and in Lahore, Pakistan ("Pakistan") operating under the name of Specialty Process Equipment Corporation.   Both of SPEC's foreign offices participated in the quotation, design, and/or fabrication of the Heaters along with SPEC's Houston office.   For example, the Project Engineer for the Heater project appointed by Sheikh was Kamran Elahi, employed at SPEC's office in Pakistan. SPEC's UAE and Pakistan operations are either part of SPEC's Texas corporation or, along with SPEC in Houston, Texas, are operated as a single business enterprise by integrating their resources to achieve a common business purpose and are treated as the same entity for liability purposes.

46.    Defendant Zafar Sheikh testified in his deposition about the SPEC offices in Pakistan and the UAE, and Sheikh's testimony created an ambiguity as to whether the foreign offices were third party entities, or sole proprietorships owned by him, or branch offices of SPEC.   Based on information and belief, Sheikh is jointly and severally liable to Beender under the single

business enterprise theory, and/or because of his ownership of SPEC's assets in Pakistan and the UAE.  In response to a deposition question as to whether there is a corporate entity in Pakistan that operates, or whether it is just Sheikh as an individual, Sheikh testified, "It's just me as an individual."   SPEC's website advertises itself as a Texas company with significant operations in Pakistan and the United Arab Emirates.

47.   In the alternative, Defendant Sheikh is, along with Defendant SPEC, jointly and severally liable to Beender because Sheikh is the *alter ego* of SPEC.  Based on information and belief, SPEC was organized and operated as a mere tool or business conduit of Zafar Sheikh; there was such unity between SPEC and Sheikh that the separateness of SPEC had ceased and holding only SPEC liable would result in injustice; Sheikh caused SPEC to be used for the purpose of perpetuating and did perpetuate an actual fraud on Beender primarily for the direct personal benefit of Sheikh; and Sheikh used SPEC as a means of evading an existing legal obligation for the purpose of perpetrating and did perpetrate an actual fraud on Beender primarily for the direct personal benefit of Sheikh.  The following facts support piercing the corporate veil:

a.   Sheikh is the sole shareholder, sole director, and president of SPEC;

b.   Based on information and belief, Sheikh has commingled

his personal funds with SPEC's corporate funds;

      c.     Sheikh has represented himself as the owner of the assets of the SPEC business operations in Pakistan and the UAE;

      d.     SPEC maintains bank accounts in foreign countries, including Pakistan, and such accounts are used, Beender contends, to place assets of SPEC beyond the reach of US creditors.

      48.     As proof of *alter ego*, the Court may also consider such factors as: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individuals will financially back the corporation; (3) the diversion of company profits to the individuals for their personal use; (4) inadequate capitalization; and (5) failure to keep corporate and personal assets separate.

      49.     Wanda Fajardo is the common law wife of Sheikh and an employee of SPEC. It is presently unknown what benefits she derived from the proceeds paid by Beender to SPEC; her deposition has not yet been taken. Beender reserves the right to pursue any of its available remedies against Fajardo.

### COUNT I – BREACH OF CONTRACT
### UN CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS

      50.     Beender incorporates by reference and re-alleges Paragraph 1 through 49 of this Complaint as set forth above.

51.   Beender and Defendant SPEC have their places of business in different nations, each of which is a contracting state to the United Nations Convention on Contracts for the International Sales of Goods ("CISG").

52.   There is no term in the Purchase Order contract or elsewhere fixing a choice of law or a conflict provision and no such terms were agreed between the parties.

53.   The CISG applies to private rights of action in U.S Federal Court to "contracts of sale of goods between parties whose place of business are in different contracting states" [CISG art. 1.1 (a)].

54.   Defendant, as the seller under CISG, breached the contract by failing to deliver and transfer the property as required by the contract [CISG arts. 30,33].

55.   Beender was entitled to cancel the contract and suspend further performance or payment and to declare a breach of the contract:

   a)   Since Defendant SPEC itself first refused to perform without payment from Beender of a different purchase price beyond the contract terms [CISG arts, 49(1), 71(1)]; and

   b)   Once Beender became aware of Defendant SPEC's inability or refusal to provide the equipment and

demanded assurances that Defendant SPEC did not provide [CISG art. 72(1)].

56.     Beender was entitled to cover its losses and mitigate damages by ordering replacement goods and having them shipped to Beender's customer in replacement of the goods ordered from Defendant SPEC.

57.     Beender is entitled, among other damages, to the return of sums paid in advance under the contract with Defendant SPEC, as well as to the recovery of attorneys' fees expended hereunder [CISG art. 74].

58.     Beender is further entitled to the difference in contract price with Defendant and the price paid in the substitute goods [CISG art. 75].

59.     Beender is further entitled to interest at the legal rate on the sums paid to Defendant SPEC [CISG art. 85].

## COUNT II – BREACH OF CONTRACT TEXAS LAW

60.     Beender incorporates by reference and re-alleges Paragraph 1 through 59 of this Complaint as set forth above.

61.     Defendant SPEC and Beender entered into a written agreement with terms certain through the Purchase Order, the Spec-Pro quote 1065182 and other documents referred to in the Purchase Order.

62.     At the time SPEC entered into the above-referenced agreement, SPEC was a "merchant" as defined in Section 2.104 of the Texas Uniform

Commercial Code ("UCC") and, as such, is charged with the knowledge and skill of merchants.

63.     When Beender had reasonable grounds for insecurity with respect to SPEC's performance, Beender requested adequate assurance in writing from SPEC that the Heaters could be delivered as ordered.  Such assurance was not provided to Beender within a reasonable time and such failure constituted a repudiation of the contract by SPEC under Section 2.609 of the UCC.

64.     Defendant SPEC also made an anticipatory breach of the contract by demanding from Beender payment amounts in addition to the contract price before it would further perform.

65.     Defendant SPEC breached the contract with Beender under the UCC and Texas common law.

66.     Beender was entitled to "cover" under the contract and seek replacement equipment to mitigate its damages.

67.     Beender has suffered damages, losses and costs due to SPEC's breach of the contract.

68.     Beender is entitled to return of the full $183,880.00 paid to SPEC.

69.     Beender is additionally entitled to recover its losses associated with the difference in the price of the cover goods from those under the contract,

namely $239,000.00, plus the difference in cost expended on shipment and delivery of the goods from the cost of shipping the goods as originally ordered from SPEC, namely $38,000.00.

70.     Beender is entitled to recover costs associated with completing the process of obtaining and delivering the cover goods, namely $106,800.00.

71.     All conditions precedent have been met on the part of Beender, or have been excused, and Beender is entitled to recover all consequential, incidental and special damages proximately caused by SPEC's breaches of contract.

72.     Beender is entitled to recover attorney's fees pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code for the prosecution of this case through trial and on appeal.

73.     Beender is further entitled to interest at the legal rate on the sums paid to SPEC.

## FRAUD

74.     Beender incorporates by reference and re-alleges Paragraph 1 through 73 of this Complaint as set forth above.

75.     Defendant Sheikh committed fraud on Beender, on behalf of SPEC in his capacity as a shareholder, director, officer, and employee of SPEC in the course and scope of his employment, and also in his individual capacity, as

employees of a corporation are liable for their own torts even when acting in the course and scope of their employment with the company.   Consequently, both Defendant SPEC and Defendant Sheikh are liable to Beender for the fraud.

76.   The misrepresentations Sheikh made to Beender before the Purchase Order was entered into between Beender and SPEC include, but are not limited to, the following:

a.   representing that SPEC had the physical capacity to complete the project in accordance with the terms of the contract;

b.   representing that SPEC had the manpower to complete the project in accordance with the terms of the contract;

c.   representing that SPEC had the financial resources to complete the project in accordance with the terms of the contract;

e.   representing that SPEC had the expertise to complete the project in accordance with the terms of the contract;

f.   representing that SPEC had the qualifications to complete the project in accordance with the terms of the contract;

g.   representing that SPEC would complete the project in a timely manner in accordance with the terms of the contract;

h.   representing that SPEC would devote sufficient manpower to complete the project when it intended to take on other projects at the

same time in accordance with the terms of the contract;

      i.    representing that SPEC could obtain the materials necessary to complete the project in accordance with the terms of the contract;

      j.    representing that SPEC had the experience and capability to fabricate the heaters in question, when in fact it had never undertaken a job to manufacture heaters of the same size and complexity.

    77.    Sheikh's misrepresentations were made with knowledge of their falsity or made recklessly without any knowledge of the truth and as a positive assertion.

    78.    The misrepresentations were made with the intention that they should be acted on by Beender.

    79.    Beender relied on the misrepresentations and thereby suffered injury and actual damages as described above.

    80.    Because of SPEC and Sheikh's fraudulent conduct, Beender is entitled to recover punitive damages from SPEC and Sheikh.

### NEGLIGENT MISREPRESENTATION

    81.    Beender incorporates by reference and re-alleges Paragraph 1 through 80 of this Complaint as set forth above.

    82.    Defendant Sheikh made negligent misrepresentations on which Beender justifiably relied, on behalf of SPEC in his capacity as a shareholder,

director, officer, and employee of SPEC in the course and scope of his employment, and also in his individual capacity. Sheikh made representations in the course of his business or in a transaction in which he has a pecuniary interest; and made representations while failing to exercise reasonable care or competence in obtaining or communicating the information.

83.    More specifically, Sheikh's negligent misrepresentations include, but are not limited to:

a.    representing that SPEC had the physical capacity to complete the project in accordance with the terms of the contract;

b.    representing that SPEC had the manpower to complete the project in accordance with the terms of the contract;

c.    representing that SPEC had the financial resources to complete the project in accordance with the terms of the contract;

e.    representing that SPEC had the expertise to complete the project in accordance with the terms of the contract;

f.    representing that SPEC had the qualifications to complete the project in accordance with the terms of the contract;

g.    representing that SPEC would complete the project in a timely manner in accordance with the terms of the contract;

h.    representing that SPEC would devote sufficient

manpower to complete the project when it intended to take on other projects at the same time in accordance with the terms of the contract;

        i.     representing that SPEC could obtain the materials necessary to complete the project in accordance with the terms of the contract.

        j.     representing that SPEC had the experience and capability to fabricate the heaters in question when in fact it had never undertaken a job to manufacture heaters of the same size and complexity.

84.    As a direct and proximate result of Sheikh and SPEC's negligent misrepresentations, Beender sustained actual damages as described above.

## CONSTRUCTIVE TRUST

85.    Beender seeks to impose a constructive trust upon all property, real or personal, acquired with the funds that Defendants obtained from Beender by theft, fraud, conversion, conspiracy or other illegal conduct.  This Court should impose a constructive trust on all property, real or personal, owned by Defendants, which was purchased or acquired with funds or property wrongfully obtained from Beender. It is well settled under Texas law that whenever one person has wrongfully taken property of another, and converted it into a new form or transferred it, a trust arises and follows the property or proceeds.

86.    Beender is entitled to trace the funds Defendants illegally obtained from Beender.  Beender is entitled to a constructive trust on such funds or

any property purchased with such funds. The tracing of funds and the imposition of a constructive trust is justified based upon Defendants' theft, fraud, conversion, unconscionable conduct and/or the unjust enrichment of Defendants. Beender has been injured and deprived of its property, based upon Defendants' conduct. In contrast, Defendants have been unjustly enriched as a result of their unconscionable conduct. A constructive trust on the property purchased or acquired with the funds Defendants wrongfully obtained from Beender is the only remedy that will prevent the unjust enrichment of Defendants.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Beender Overseas, Ltd. prays for the following relief:

a) Recovery from the Defendants of all general and special damages (past, present and future) as allowed by law and as will fully and fairly compensate Plaintiff, plus such other damages as may be proven with more specificity at trial;

b) Recovery from the Defendants of Plaintiff's attorneys' fees and court costs;

c) Recovery from the Defendants of interest at the legal rate on the sums paid to Defendants.

d) Such other relied as is equitable and appropriate.

Respectfully submitted,


_____

PAUL D. CLOTE
Attorney in Charge
State Bar No. 04407300
Four Houston Center
1221 Lamar, Suite 1090
Houston, Texas 77010-3038
(713) 659-2800
(713) 654-0052 FAX

LEAD COUNSEL FOR PLAINTIFF
BEENDER OVERSEAS, LTD.

DOMINIQUE M. H. LEMOINE
Sokolow, Carreras, Lemoine &
Partners, LLP
115 Perimeter Center Place, Suite 495
Atlanta, Georgia 30346
(770) 351-0099
(770) 351-0097FAX

CO-COUNSEL FOR PLAINTIFF
BEENDER OVERSEAS, LTD.

<u>EXHIBIT A</u>

PURCHASE ORDER DATED SEPTEMBER 27, 2005

# BEENDER Overseas Ltd.

C/o EQUITY ENERGY, INC,
17 SQUARE EDOUARD VII
PARIS 75009 - FRRANCE
Tel:       (33) (1) 53 43 93 69
Fax:      (33) (1) 53 01 29 78

# PURCHASE ORDER

PO Number shall be mentionned on Invoices.
**PURCHASE ORDER N°:**       IPO-050901

ATTN:
SPECIALTY PROCESS EQUIPMENT
5946 RIDGEDALE DRIVE - HOUSTON
HOUSTON - TX - 77039
ZAFAR SHEIKH - (281) 227 9577
QUOTE REF# 050182

| | | | DATE | Sept 27, 2005 |
|---|---|---|---|---|
| | | | CONDITIONS | Deliv, by 01/31/06 |
| | | | PAYMENT | Schedule |
| | | | DELIVERY | Ex work |

| 2 | Ea. | HEATERS 301 A/B | $229 850,00 | $459 700,00 |
|---|---|---|---|---|
| | | Hetaers as per Spec-Pro quote 05182 dated 09/05/06 Hetaers to be built in accordance to Drawings and information provided in the data book sent by mail and information contained in 02 emails sent on Sept 1,2005 | | |
| | | **Delivery:** Jabuary 31, 2006 Latest – 2% Late delivery penaly applies | | |
| | | **Payment Terms:** 20% with the receipts of PO 20% upon receipt of major material, head, shell, tubes & coils 40% upon 50 to 70% Fabrication Completed 20% upon shipment | | |

| *Four Hundred fifty Nine Thousand and seven hundred US Dollars* | TOTAL EX WORK | $459 700,00 |
|---|---|---|
| | PACKING | $0,00 |
| | FREIGHT | $0,00 |
| | TOTAL C+F | $459 700,00 |

S, BOURICHA / Director                          September 29, 2005
**APPROVED BY**                                              **DATE**

Vendor:         SPECIALTY PROCESS EQUIPMENT CORPORATION

Signed by:

*By signing above, vendor aknowledge receipt and acceptance of purchase order*

Please sign this Purchase order for acceptance and fax it back to us at +33 1 53 01 29 78 for validation of order

# EXHIBIT "A"

**EXHIBIT B**

SPEC QUOTE #05182

Fabricator ASME "S, U, R & B31.1"

September 5, 2005

BEENDER Overseas Ltd.

Paris, France

      Attn:   Manager Procurement
      Tel:
      Fax:
      E-mail:

Ref:    Inquiry No.
       Heaters
       SPEC Quote No. 05182

Gentlemen:

Following is our Proposal for the above referenced project.  If you have any questions, please contact the writer.

Very Truly yours,
Specialty Process Equipment Corp.

By:
Zafar Sheikh
Sales, Proposals and Estimating

# EXHIBIT "B"




5946 Ridgedale Drive, Houston, Texas 77039, USA;  Tel: (281) 227-9577, Fax: (281) 227-9578
E-mail: sales@spec-pro.com, www.spec-pro.com

Fabricator ASME "S, U, R & B31.1"

## 1.0 Structural Steel Skid

One (1) only 3963 mm (13'-0") wide x 13700 mm (45'-0") long skid designed and constructed to accommodate equipment and piping as per bid drawings, and includes the following:

- W12" main members
- Skid is designed to be installed on six points
  Customer to ensure foundation design is adequate of fully loaded heater
- Four (4) lifting lugs
- 1/4" checker plate floor on walkways

## 2.0 Equipment

### 2.1 Heaters 301 A/B

ONE  2900 mm x 10500 mm (114" O.D. x 34'-6") long indirect fired heater as follows:

**Design Data (Heater Shell and Expansion Tank)**

| | |
|---|---|
| Design and Construction: | API 12K and manufacturer's standard |
| Service: | Non Corrosive EG/water, 85% weight |
| Design Pressure: | Atmospheric |
| Design Temperature: | 150°C |
| M.D.M.T.: | 15°C |
| External Pressure: | Atmospheric |
| Radiography: | None |
| Corrosion Allowance: | None |
| Ends: | 25 mm plate, SA-516-70 |
| Shell: | 12 mm rolled plate, SA-516-70 |
| Hydrotest: | Atmospheric leak test filled with water |
| P.W.H.T.: | No |

**Design Data (Removable Coil)**

| | |
|---|---|
| Design and Construction: | ASME Code B31.3 – 1999, Addenda 2000 |
| Service: | Sweet Crude Oil |
| Design Pressure: | 10 barg |
| Design Temperature: | 150°C |
| M.D.M.T.: | 15°C |
| External Pressure: | Atmospheric |
| Radiography: | 100% |
| Corrosion Allowance: | 3.0 mm |
| Pipe: | 3 x 24 passes of 4" XH seamless pipe, SA-106-B |
| Return Bends: | 4" XH seamless 180° short radius, SA-234-WPB |
| Inlet Header | 8" 150# RF and Sch-40 pipe |
| Outlet Header | 8" 150# RF and Sch-40 pipe |
| Hydrotest: | 1.5 times Design Pressure |
| P.W.H.T.: | Not Required |






Fabricator  ASME "S, U, R & B31.1"

Design Data (Removable Double Firetube)

| | |
|---|---|
| Design and Construction: | API 12K |
| Service: | Sweet Fuel Gas |
| Design Pressure: | Atmospheric |
| External Pressure: | Atmospheric |
| Radiography: | 100% of mitre welds |
| Corrosion Allowance: | 3 mm |
| Pipe: | 24" O.D. x 0.375" wall, SMLS, SA-106-B |
| Nominal Duty: | 1012 kW per firetube, 2024 kW total |
| Surface Area Heat Flux: | 8100 Btu/HrFt2 |
| Cross Section Heat Flux: | 8140 Btu/Hrin2 |
| Mitre Type: | 5-piece |
| Hydrotest: | Atmospheric leak test |
| P.W.H.T.: | No |

Nozzles

| Qty | Size | Rating | Type | Service |
|---|---|---|---|---|
| 2 | 8" | 150# | RF | Crude Oil Inlet/Outlet |
| 1 | 4" | 150# | RF | Drain |
| 2 | 2" | 150# | RF | Fuel Gas Preheat |
| 1 | 8" | FF | Fab. | Expansion Tank |
| 1 | 8" | FF | Fab. | Fill |
| 1 | 2" | 3000# | NPT | Level Switch Low |
| 2 | 1/2" | 3000# | NPT | Level Gauge |
| 3 | 1" | 3000# | NPT | TI / TSHH / TC |

Attachments and Accessories

| Qty | Description |
|---|---|
| 2 | Heater saddles |
| 2 | Expansion tank saddles |
| 2 | 24" O.D. x 20'-0" long removable stacks c/w rain cap |
| 1 | 762 mm (30") O.D. x 5000 mm (16'-6") long horizontal expansion tank c/w two (2) saddles, one (1)-8" thief hatch, and nozzles per bid drawings |
| 1 | 2" fuel gas preheat coil |
| 1 | Lot coil tubesheets and roller supports |
| 1 | Firetube hold down and roller assembly |
| 1 | 8" 150# coil inlet header |
| 1 | 8" 150# coil outlet header |
| 2 | Flame Arrestor Assemblies |
| 1 | Ladder with safety hoop to expansion tank |
| 1 | s.s. name plate c/w c.s. mounting bracket |

 5946 Ridgedale Drive, Houston, Texas 77039, USA; Tel: (281) 227-9577, Fax: (281) 227-9578
E-mail: sales@spec-pro.com, www.spec-pro.com 

Fabricator  ASME "S, U, R & B31.1"

## 3.0 Piping

Inlet and outlet crude oil spools are included.  Fuel gas piping and instrument air piping is included.

## 4.0 Inspection and Testing

Inspection and testing are included as follows:

| Item | Description |
|------|-------------|
| Heater | • Atmospheric leak test |
| Firetube | • 100% radiography of firetube return bend mitres<br>• Atmospheric leak test |
| Process Coil | • 100% radiography of 100% of total butt welds<br>• hydrotest to 1.5 times design pressure |

## 5.0 Material Specifications

All materials quoted are as listed, except as otherwise shown in detailed description of individual equipment.

| **Component** | |
|------|------|
| Pipe: | SA-106-B |
| Flanges: | SA-105 |
| Weld Fittings: | SA-234-WPB |
| NPT Fittings/olets: | SA-105 |
| Gaskets: | 304 SS SWGF/neoprene |
| Studs: | SA-193-B7 |
| Nuts: | SA-194-2H |
| Instrument Tubing: | 316 stainless steel |
| Instrument Tube Fittings: | Swagelok 316 stainless steel |
| Heater Attachments | |
|     Internals: | SA-36 and/or CSA G40.21Gr. 44W |
|     Externals: | SA-36 and/or CSA G40.21Gr. 44W |

## 6.0 Painting/Coating

The completed heater would be cleaned and painted as follows:

### External

• SSPC-SP6 sandblast
• 1-shop coat primer
• 1-shop coats finish paint (non insulated surfaces only)

### Internal

No internal coating is included in this quotation.

---





5946 Ridgedale Drive, Houston, Texas 77039, USA;  Tel: (281) 227-9577, Fax: (281) 227-9578
E-mail: sales@spec-pro.com, www.spec-pro.com



Fabricator  ASME "S, U, R & B31.1"

## 7.0 Insulation

Insulation is included for heater shell as follows:

- 2" thick fibreglass
- 0.20" smooth aluminium sheathing
- Stainless steel banding
- Expansion Tank is not insulated

## 8.0 Instruments, Miscellaneous Equipment & Valves

**SDV-200**
2" 150# RF Ball Valve
Port Dia. 1-1/2"
Valve Fails Closed, Soft Seats
Steel Body, Standard Trim
Rack and pinion actuator

**TCV-200**
2" 150# RF CVS "E" Body type control valve
Port Dia. 2-5/16"
Valve Fails Closed, Softl Seats
Steel Body, Standard Trim
Size 40 Actuator, Actuator Input: 6-30 psi

**PCV-200**
FISHER REGULATOR, 627
2" NPT Ductile Iron Body, SS Trim
Aluminum Spring Casing and Diaphragm
Port Dia 3/8", 5-20 psi Spring

**PCV-201**
FISHER REGULATOR, 67CFR
1/4" NPT Aluminum Body, Standard Trim
Spring Range 3-15 psi

**XY-201, 202,**
ASCO Solenoid EF8320G201 24VDC
3 way direct acting, universal operation
1/4" NPT  1/8" orifice size
303 SS body
CSA Class 1 Div 1 Group D Explosion Proof Classification

**LSLL-100**
SOR Electric Level Switch Model 1510B-G5A-C-W9-ES-CS
1 1/2" NPT, 303 SS Body, 316 SS Float
1500 psi Maximum Process Pressure
-40 to 400 F Process Temperature
0.4 Minimum Specific Gravity

**LG-100**
Quality Gauge Tubular  level gauge
Model Q170, 762 mm visible length
Std gauge cocks





5946 Ridgedale Drive, Houston, Texas 77039, USA;  Tel: (281) 227-9577, Fax: (281) 227-9578
E-mail: sales@spec-pro.com, www.spec-pro.com

Fabricator ASME "S, U, R & B31.1"

**TC-100**
Foxboro 43AP Indicating Temperature Controller,
Model 43AP-FA45D / TSS-S3B-15
Proportional plus reset, 6-30 psi output
Scale 0-150°C, Calibrated 0-150°C
2 position nozzle seal
Adjustable union, bendable extension, 15' capillary
316 SS thermowell

**TI-100**
TEMPERATURE GAUGE, Every angle adjustable
5" Dial, 1/2" NPT Center Back
Connection, -20 to 200 deg C Scale, 12" Stem.
Trend MOD 50120

THERMOWELL 0.260 Bore
1" NPT     12" Lg     1/2" NPT
316 SS Material, Stepped Stem

**TI-200, 201**
TEMPERATURE GAUGE, Every angle adjustable
5" Dial, 1/2" NPT Center Back
Connection, -20 to 100 deg C Scale, 6" Stem.
Trend MOD 500060

THERMOWELL 0.260 Bore
1" NPT     6" Lg     1/2" NPT
316 SS Material, Stepped Stem

**PI-200, 201**
PRESSURE GAUGE, 0-2 Barg scale
4" Dial  SS Case and Bourdon Tube, 1/2" BM
Liquid Filled,
Wika or equal

**PI-202**
PRESSURE GAUGE, 0-1 Barg scale
4" Dial  SS Case and Bourdon Tube, 1/4" BM
Liquid Filled,
Wika or equal

**TSHH-100**
SOR temperature switch, DPDT
0-200°C range, 5 foot armoured capillary
CSA Class 1 Div 1 Group D Explosion Proof Classification

**For: TSHH-100**
THERMOWELL 0.260 Bore
1" NPT     12" Lg     1/2" NPT
316 SS Material, Stepped Stem

**BS/BIC/BE-200**
Flame Failure/Ignition System, Thermocouple Based
J.W. Nagy model FGI-202 Flame-Guard/
Ignition system including:
- Type 5 & 6 fibreglass enclosure





Fabricator ASME "S, U, R & B31.1"

8" x 6" x 4" CSA Class 1, Div 2 approval
- 446 SS thermocouple probes c/w connectors
 - Two FGI-100-S DC spark generators c/w base, coil and circuit card
 - Honeywell ignition electrode
 - High temp ignition wire (10' req'd)
 - Probe/electrode mounting bracket (1/2" size)
 - Ensure unit is capable of auto re-light
 - Remote start and stop capability
 - Flame fail contacts for remote detection.

## 9.0 Electrical

All electrical end devices are wired.  Wiring will be to CSA electrical code and suitable for a Zone 2 area.

**WEIGHT**
Package shipping weight:  48,000 kgs
Package weight full of water:  105,000 kgs
Operating weight: 99, 500 Kgs

**Skid Footprint**
3693 mm wide  x  13 700 mm Long



5946 Ridgedale Drive, Houston, Texas 77039, USA;  Tel: (281) 227-9577, Fax: (281) 227-9578
E-mail: sales@spec-pro.com, www.spec-pro.com





Conditions of Quotation and Sale

Price:  $229,850.00 USD

FOB:  Houston, Texas

Delivery Schedule:                              Weeks
Pre-Award meeting                    -            -
PO award by        -                  -
Drawing first submittal              2            2
Drawing approval                     1            3
Coordination Meeting                 3-4 wks ARO
Procurement & Fabrication            12           15
Ready to ship    0                   15

Payment Terms:
To Be Agreed

Respectfully submitted,
**Specialty Process Equipment Corp.**

By:
Zafar Sheikh
Sales, Proposals and Estimating


